**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ADT SECURITY SERVICES, INC.**, <br><br>　　　　Plaintiff, <br><br>　　vs. <br><br>**SECURITY ONE INTERNATIONAL, INC.** *et al.*, <br><br>　　　　Defendants. | Case No.: 11-CV-05149 YGR <br><br> **ORDER DENYING MOTION OF ADT SECURITY SERVICES, INC. FOR CONTEMPT AGAINST SECURITY ONE INTERNATIONAL, INC. AND CLAUDIO HAND; AND MODIFYING THE PRELIMINARY INJUNCTION** |

Plaintiff ADT Security Services, Inc. ("ADT") has sued Security One International, Inc. ("Security One"), Claudio Hand, Scellusaleads and Pure Clar for unfair and deceptive business practices. On November 17, 2011, the Court entered the parties' Agreed Preliminary Injunction ("Injunction") as an Order of the Court, enjoining the Defendants from engaging in certain of the alleged unfair and deceptive business practices. (*See* Dkt. No. 32.)

ADT has filed a Motion for Contempt Against Security One International, Inc. and Claudio Hand (Dkt. No. 118-1 ("Mot.")) on the grounds that ADT has discovered eleven violations of the Injunction. The Court held an evidentiary hearing on December 18, 2012,[1] and the parties presented oral argument on December 19, 2012.

Having carefully considered the papers submitted, the Injunction, the testimony of the witnesses, and the argument of counsel, for the reasons set forth below, the Court hereby **DENIES** the Motion for Contempt; and **MODIFIES** the Injunction.

---

[1] At the hearing ADT called one witness and Security One called three witnesses. Prior to the hearing the parties provided excerpts of deposition transcripts of twelve additional witnesses and a declaration of another witness. The Court reviewed this testimony prior to the evidentiary hearing.

## I.     FINDINGS OF FACTS

The Court makes the following findings of fact:

1. ADT and Security One are competitors in the residential alarm market, and often compete for the same customers.

2. On October 20, 2011, ADT filed a Complaint and Motion for Preliminary Injunction against Security One, Claudio Hand, and others that have since been dismissed from this action. (Dkt. Nos. 1 & 3.)

3. The parties stipulated to an Agreed Preliminary Injunction, which was entered by the Court on November 17, 2011.  (Dkt. No. 32.)

4. In pertinent part, the Injunction provides:

> Defendants, their agents, servants, employees, officers, attorneys, successors, and assigns are PRELIMINARILY ENJOINED pending further Order of this Court, from:
>> a. Informing ADT customers that ADT has authorized SECURITY ONE to take over or handle the accounts or technical support service for ADT customer accounts;
>> b. Informing ADT customers that SECURITY ONE has "bought out" ADT and is ADT's new security service provider;
>>
>> \*          \*          \*
>>
>> d. Representing to ADT customers that SECURITY ONE is affiliated with ADT and that ADT has authorized SECURITY ONE to provide an "upgrade" to ADT's security system;
>>
>> \*          \*          \*
>>
>> f. Making any false statement that SECURITY ONE is an agent of ADT.
>> g. Making a false statement to any ADT customer that ADT is no longer doing business, or has limited or eliminated any services;
>> h. Making any material false statement of fact regarding ADT including, but not limited to, function, performance, capabilities, specifications, features, requirements, reliability, availability, origin, sponsorship, approval, or design of any ADT equipment, alarm system, sales, or service.

### A.     SECURITY ONE'S SALES PROCESS

5. Security One uses a Philippines-based telemarketing company, Scellusaleads, as its primary means of generating sales leads.

6. Pure Clar is the owner and operator of Scellusaleads.

7. Security One has no written agreement with Scellusaleads.

8. On a weekly basis, Security One engages approximately twelve telemarketers from Scellusaleads to make sales calls to individuals in the United States.

9. The Scellusaleads telemarketers make these sales calls from 12:00 p.m. until 8:00 p.m. (PST), Monday through Friday, and occasionally on Saturdays.

10. Scellusaleads cold calls thousands of consumers per day to interest the consumer in purchasing an alarm service contract from Security One.

11. Security One pays a weekly flat rate for Scellusaleads to generate sales leads based on the number of callers used; it does not pay on a per-lead basis, though Mr. Hand occasionally buys the telemarketers lunch if they meet a particular sales target.

12. Approximately ninety percent of Security One's sales leads are generated by Scellusaleads.

13. Security One rarely conducts door-to-door sales.

14. Security One employs a five-step sales process.

15. First, Scellusaleads cold calls consumers to sell Security One's alarm service. If the first step is successful then Scellusaleads puts the customer on hold and proceeds to Step Two.

16. In Step Two, a second Scellusaleads supervising agent speaks with the customer to confirm the sale and to schedule an appointment for installation of the alarm monitoring equipment.

17. Upon notification that Scellusaleads has set up an appointment, a Security One representative will perform Step Three of the sales process, which is to contact the customer to reconfirm the lead and the appointment; Step Three is substantially the same as Step Two.

18. Step Four is the installation. In Step Four, a technician, usually an independent contractor, visits the customer's house, reviews the paperwork with the customer, and if the customer signs the contract, then the technician will install the security monitoring system or reprogram the existing system.

19. After installation, the technician will perform Step Five, which is a post-installation call with a Security One representative. The technician calls Security One, hands the mobile phone to the customer, who speaks with a Security One customer service representative.

20. Scellusaleads conducts the first two steps of the five-step sales process.

21. Security One contends that Scellusaleads uses a sales script when it generates the sales lead in Step One and when it confirms the sales lead in Step Two.

22. Claudio Hand has instructed Pure Clar, the owner of Scellusaleads to require her agents use the sales scripts.

23. Mr. Hand has visited the Philippines on at least three occasions and observed agents of Scellusaleads using the sales scripts.

24. Mr. Hand does not know if Scellusaleads follow the sales scripts when he is not present.

25. The Step One solicitation call is not recorded.

26. Scellusaleads telemarketers sometimes provide information not contained in the sales script while conducting the initial telephone solicitation in Step One.

27. With respect to misrepresentations during Step One that General Electric or Honeywell is recommending that the customer switch from ADT to Security One or that General Electric and Honeywell are no longer affiliated with ADT, the confirmation scripts in Steps Two and Three do not correct the misrepresentations.

28. Prior to October 27, 2012, if the initial telemarketer represented that ADT had gone out of business, the confirmation scripts in Steps Two and Three would not correct that representation.

29. Steps Three, Four and Five are conducted in the United States.

30. The Security One representative confirming the appointments in Step Three, and the Security One customer service representative confirming the installation in Step Five follow a written script.

31. The written scripts are followed during Steps Three and Five.

4

32. The Step Three and Step Five calls are recorded, and the recordings are maintained by Security One.

33. To assist customers who switch services, Security One provides a form of cancellation to be provided to the former security company.

### B. THE PARTIES' STIPULATED FACTS

34. Security One is not affiliated with ADT, including not being partners with ADT.

35. Security One is not affiliated with ADT or authorized by ADT to service ADT's customers, including providing an "upgrade" to an ADT customer's alarm system.

36. Security One has not "bought out" ADT or any of ADT's security monitoring accounts.

37. ADT did not go out of business and Security One is not taking over alarm system monitoring responsibilities for ADT.

38. ADT does not provide alarm system monitoring to customers that are switched to Security One.

39. ADT does not disclose information regarding its customers to anyone, including Security One.

40. General Electric and Honeywell continue to do business with and sell alarm system equipment to ADT.

### C. THE ALLEGED VIOLATIONS OF THE INJUNCTION[2]

**Mr. Scott Harer**

41. In August 2012, a Scellusaleads telemarketer called Scott Harer in the evening and the caller identified herself as calling from Security One.

---

[2] ADT argues in its briefs that it has discovered eleven violations of the Injunction. ADT's Motion identifies seven alleged violations and its Reply brief (Dkt. No. 130) adds an additional four alleged violations. However, in its Proposed Findings of Fact and Conclusions of Law, ADT proposes a finding of only ten violations of the Injunction. At the contempt hearing ADT argued that it had provided sufficient evidence for the Court to find five violations of the Injunction, essentially conceding that six of the alleged violations are not supported by sufficient evidence. Those violations related to these witnesses: Lawrence Chan, Quentin McKinney, Richard Weiner, Glen Williams, Jamie Tandberg, and Cheryl Leal. Accordingly, the Court will address only the five witnesses for whom ADT contends it has provided sufficient evidence for the Court to find a violation of the Injunction.

...

42. Mr. Harer "believed that when the lady had called [his] house to offer [him] a new deal, that ADT had been bought and that they were going to give us lower monthly payments." (Deposition of Scott Harer ("Harer Dep."), Dkt.No. 161-2, Ex. A-1, at 6:17-21.)[3]

43. Mr. Harer testified that he is uncertain whether the caller stated that ADT had been bought out because there was a lot of background noise making it difficult to hear and Mr. Harer was not giving the caller his full attention. (*Id*. at 7:5-11; 16:6-17:3; 17:18-20 ("the noise in the background, I wasn't 100 percent paying attention to her at that point").)

44. The Security One representative did not tell Mr. Harer that Security One was affiliated with ADT. (*Id*. at 26:12-14.)[4]

**Ms. Pamela McCollom**[5]

45. Between April and July of 2012, Security One called Pamela McCollom on five or six occasions to solicit her business. (Deposition of Pam McCollom ("McCollom Dep."), Dkt. No. 161-2, Ex. A-2, at 8:8-9:5.)

46. During those telephone calls, Security One stated that they "were affiliated with ADT" and that ADT and Security One were "partners." (*Id.* at 9:21-10:2; 28:6-28:18.)

47. Security One told Ms. McCollom that Security One received her contact information from Honeywell. (*Id.* at 14:6-14:23.)

**Ms. Mamie Buchanan**

48. On July 9, 2012, Ms. Buchanan received a call from a sales representative of Security One who stated that he could lower her monthly rate and "upgrade" her ADT alarm

---

[3] With respect to Mr. Harer, ADT alleges that in August 2012, Security One called Mr. Harer and stated that "ADT had been bought out and that [Security One] was taking over." (Reply at 7.)

[4] Q: Did Security One ever tell you that they were affiliated with ADT in any way?
A: No.
(Harer Dep. at 26:12-14.)

[5] With respect to Ms. McCollom, ADT alleges that Security One stated that ADT had provided Security One with her contact information; and that ADT was "selling a portion of the company to them." (Mot. at 6, ¶ 6.) Ms. McCollom's deposition testimony does not address the topic of whether Security One told her that ADT was "selling a portion of the company to" Security One such that there is no evidence from which the Court can make a factual finding as to this allegation.

equipment. (Declaration of Ms. Mamie Buchanan ("Buchanan Dec."), Dkt. No. 157-5, Ex. B, at ¶ 3.)

49. The sales representative from Security One stated that if she accepted the "upgrade" and the lower rate, Security One would "provide the monitoring" for her home. (*Id.*)

50. Ms. Buchanan believed that the sales representative was affiliated with ADT because the Security One sales representative had knowledge of her personal information, including payment information. (*Id.* ¶ 5.)

**Ms. Sharlene Dore**

51. In April 2012, Ms. Dore received a telephone call from a representative of Security One who claimed to be calling from either General Electric or Honeywell. (Deposition of Sharlene Dore ("Dore Dep."), Dkt. No. 161-2, Ex. A-4, at 7:11-13; 7:17-19; 7:25-8:5.)

52. The caller informed Ms. Dore that General Electric and Honeywell "were no longer affiliated with ADT." (*Id.* at 8:4-5.)

**Ms. Barbara Bleier**

53. Ms. Bleier received a telephone call from a representative of Security One who stated that he was going to be in the area and that Security One was going to be revamping all the security systems in the area. (Deposition of Barbara Bleier ("Bleier Dep."), Dkt. No. 161-2, Ex. A-5, at 7:22-25; 11:23-12:2; 13:8-10, 20-21.)

54. When Ms. Bleier asked "is ADT out of business and you are taking over for them? He [the caller] said, "No." (*Id*. at 8:1-4.)[6]

---

[6]   Q: Did the sales representative tell you that Security One was taking over monitoring in your area?
A: No.
\*   \*   \*
He did not say he was taking over. I assumed. The way he worded his – the way he worded his conversation to me I assumed that's what was happening. Why would I want to change my security system? I am not unhappy. So naturally I assumed that ADT was going out of business and that's when I asked him [if ADT was going out of business]. He said no.
(Bleier Dep. at 13:23-14:10.)

## II.     CONCLUSIONS OF LAW

1.     "[A] district court ordinarily should not impose contempt sanctions solely on the basis of affidavits"; rather a court should allow the alleged contemnor an evidentiary hearing. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998).

2.     The party moving for civil contempt has the burden to show (1) by clear and convincing evidence (2) that the alleged contemnors violated a specific and definite order of the Court; (3) beyond substantial compliance; and (4) not based on a good faith and reasonable interpretation of the Court's order. *Labor/Cmty. Strategy Ctr. v. Los Angeles County Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (quoting *In re Dual-Deck Video Cassette Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)).

3.     If the moving party meets its burden, "the burden then shifts to the contemnors to demonstrate why they were unable to comply." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting *Stone v. City & County of San Francisco*, 968 F.3d 850, 856 n.9 (9th Cir. 1992)).  The non-moving party's burden is to show they "have performed 'all reasonable steps within their power to insure compliance'" with the Court's order. *Stone*, supra, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976), *cert. denied*, 430 U.S. 931 (1977)).

4.     ADT has not shown by clear and convincing evidence that Security One or Mr. Hand failed to substantially comply with the Injunction.

### Mr. Scott Harer

5.     The allegation that Security One called Scott Harer and stated that "ADT had been bought out and that [Security One] was taking over" is not supported by clear and convincing evidence.

### Ms. Pam McCollom

6.     The allegation that Security One told Ms. McCollom that ADT had provided Security One with her contact information is contradicted by her testimony,[7] and the allegation that

---

[7] "Well, I asked them how they got all my information.  And they said that they got it from Honeywell." (McCollom Dep. at 10:23-25.)  Also contradicted by deposition testimony is ADT's allegation that Security One told Mr. Richard Weiner that his alarm manufacturer was working with a different company than ADT.

8

Security One told Ms. McCollom that ADT was "selling a portion of the company to" Security One is unsupported by any testimony.

7. Representing to Ms. McCollom that Security One is "affiliated with ADT" and that ADT and Security One are "partners" is a technical violation of Provision 1(h) of the Injunction that, without more, does not support a finding of contempt.

**Ms. Mamie Buchanan**

8. The allegation that Security One told Ms. Mamie Buchanan that Security One could "upgrade" her ADT alarm system equipment does not violate the Injunction.[8]

**Ms. Sharlene Dore**

9. Representing to Ms. Dore that General Electric and Honeywell "were no longer affiliated with ADT"[9] is a technical violation of Provision 1(h) of the Injunction that, without more, does not support a finding of contempt.

**Ms. Barbara Bleier**

10. There is no evidence that Security One told Ms. Bleier that it was "taking over" the alarm system monitoring of ADT customers in her area.[10]

11. Giving "Ms. Bleier the impression that ADT was going out of business and Security One was affiliated with ADT" does not violate the Injunction.[11]

---

[8] ADT believes this violates Provision 1(d) of the Injunction, which enjoins Defendants from representing "that SECURITY ONE is affiliated with ADT *and* that ADT has authorized SECURITY ONE to provide an 'upgrade' to ADT's security system."  (Injunction at ¶ 1(d) (emphasis supplied).)

[9] *Compare with* ADT's allegation that Security told Mr. Richard Weiner that his alarm system manufacturer was now working with a different company than ADT:
   Q:  Did the sales representative on any of these telephone calls inform you that the manufacturer of your alarm system was working with a different company than ADT?
   \*   \*   \*
   A:  I'm not sure.  No ….
(Deposition of Richard Weiner, Dkt. No. 161-2, Ex. A-3, at 15:22-16:8.)

[10] "I asked him, you know, Why, is ADT out of business and you are taking over for them?  He said, 'No.'" (Bleier Dep. at 8:1-4.)

[11] ADT believes that the Defendants violated the Injunction because they "gave Ms. Bleier the impression that ADT was going out of business and Security One was affiliated with ADT."  (*Id.* at 5; *see also* Deposition of Lawrence Chan, Dkt. No. 161-3, Ex. B at 21:5-7 ("And they're telling me I'm cancelling ADT.  But for some reason, I was under the assumption I was getting the exact same service.").)

9

**Scellusaleads**

12. Although ADT has failed to carry its burden to show that Defendants are in contempt, Security One's agents Scellusaleads and Pure Clar continue to make misrepresentations to ADT customers but these misrepresentations do not violate the Injunction, as drafted.

13. Security One has not taken reasonable steps to ensure that its agents Scellusaleads and Pure Clar will stop making misrepresentations to ADT customers.

## III.   CONCLUSION

For the reasons set forth above, the Motion for Contempt Against Security One International, Inc. and Claudio Hand is **DENIED**.

Because Security One has not demonstrated that it has taken reasonable steps to control its agents Scellusaleads and Pure Clar, and because it is benefitting from the conduct of its agents, the Court hereby Supplements the Preliminary Injunction as follows:

1. Defendants, their agents, independent contractors, servants, employees, officers, directors, and telemarketers are prohibited from making any false representation to any ADT customer while soliciting the customer's business, including *without limitation*, as it relates to their relationship and/or affiliation with the manufacturer of the customer's alarm system equipment (*i.e.* General Electric or Honeywell).

2. To the extent that defendants Scellusaleads and Pure Clar have not submitted to the jurisdiction of this Court, Security One, Hand, their employees, servants, officers, directors, related companies, predecessor/successor companies, affiliates, subsidiaries, and/or any other person or entity involved in the generation of sales leads on behalf of Security One shall cease immediately from using Scellusaleads and Pure Clar, their employees, officers, directors, related companies, predecessor/successor companies, affiliates, or subsidiaries for purposes of generating sales leads for Security One until Security One can satisfy the Court that sufficient safeguards are in place to verify compliance with this Order.

3. Security One shall extend the "Right to Cancel" period for former ADT customers who are switching services to Security One as follows:  (a) seven business days after the date of the

10

transaction; or (b) five days *after the postmark date* on the cancellation letter mailed to ADT, whichever occurs later.

This Order Terminates Docket Number 118.

**IT IS SO ORDERED**.
**Date:   January 3, 2013**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**