UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ADT SECURITY SERVICES, INC.**,<br><br>Plaintiff,<br><br>v.<br><br>**SECURITY ONE INTERNATIONAL, INC., ET AL.**,<br><br>Defendants. | Case No.  11-cv-05149-YGR<br><br>**ORDER ON CROSS-MOTIONS FOR ORDERS TO SHOW CAUSE RE: CONTEMPT OF PERMANENT INJUNCTION AND PROTECTIVE ORDER**<br><br>Re: Dkt. Nos. 377, 391 |

Plaintiff ADT Security Services, Inc. ("ADT") filed a Motion for Order to Show Cause regarding alleged contempt by defendant Security One International Inc. ("Security One"). (Dkt. No. 377.) The Court heard argument on June 7, 2016.[1] Subsequent to the hearing, the parties submitted requests for additional discovery in connection with the motion. (Dkt. No. 399, 401.) The Court then ordered discovery on and further briefing concerning the alleged contempt by Security One. (Dkt. No. 403.) The parties completed supplemental briefing based on this additional discovery on August 19, 2016.

The Court, having thoroughly considered the briefing, arguments, and evidence submitted by the parties, sets forth its preliminary findings and **ORDERS** a further scheduling conference as stated herein.

---

[1] Defendant Security One filed a Motion for Order to Show Cause regarding alleged contempt by ADT, on which the Court heard argument June 7, 2016, as well. Subsequent to the hearing, in their June 15, 2016 filing, Security One indicated that, based upon ADT's supplemental filing on May 26, 2016, Security One no longer seeks additional discovery on the subject of its contempt allegations, but rests on its papers and requests only an award of attorneys' fees and an admonishment of ADT for its conduct. (*See* Dkt. No. 401 at n.2.)

## I.  BACKGROUND

### A.  Proceedings Leading to Permanent Injunction

This action was originally filed October 20, 2011. (Dkt. No. 1.) On November 17, 2011, Judge Ware entered the parties' Agreed Preliminary Injunction ("Preliminary Injunction") as an Order of the Court, enjoining the Defendants from engaging in certain of the alleged unfair and deceptive business practices. (*See* Dkt. No. 32.) In pertinent part, the Preliminary Injunction provided:

> Defendants, their agents, servants, employees, officers, attorneys, successors, and assigns are PRELIMINARILY ENJOINED pending further Order of this Court, from: …. (h) Making any material false statement of fact regarding ADT including, but not limited to, function, performance, capabilities, specifications, features, requirements, reliability, availability, origin, sponsorship, approval, or design of any ADT equipment, alarm system, sales, or service.

(*Id.*) The case was subsequently reassigned to the undersigned in January of 2012.

On September 14, 2012, ADT filed a Motion for Contempt Against Security One International, Inc. and Claudio Hand (Dkt. No. 118). The Court held an evidentiary hearing on December 18, 2012, and the parties presented oral argument on December 19, 2012.

On January 3, 2013, the Court entered an order denying the motion for contempt and modifying the preliminary injunction to provide:

> 1. Defendants, their agents, independent contractors, servants, employees, officers, directors, and telemarketers are prohibited from making any false representation to any ADT customer while soliciting the customer's business, including *without limitation*, as it relates to their relationship and/or affiliation with the manufacturer of the customer's alarm system equipment (*i.e.* General Electric or Honeywell).
>
> 2. To the extent that defendants Scellusaleads and Pure Clar have not submitted to the jurisdiction of this Court, Security One, Hand, their employees, servants, officers, directors, related companies, predecessor/successor companies, affiliates, subsidiaries, and/or any other person or entity involved in the generation of sales leads on behalf of Security One shall cease immediately from using Scellusaleads and Pure Clar, their employees, officers, directors, related companies, predecessor/successor companies, affiliates, or subsidiaries for purposes of generating sales leads for Security One until Security One can satisfy the Court that sufficient safeguards are in place to verify compliance with this Order.

1    On June 17, 2013, ADT filed a motion for contempt of the January 3, Order (Dkt. No. 212). The Court advanced the trial date in the action to consider the merits and the alleged contempt in proceedings that commenced September 16, 2013.

At the conclusion of that trial, the case settled and the parties filed a motion for entry of an agreed permanent injunction. (Dkt. No. 367, Permanent Injunction.) The Permanent Injunction, entered October 1, 2013, provided that Security One was prohibited, in pertinent part, from:

> (1)… making the following false representations or engaging in the following conduct:
> \*\*\*
> (j) Making any false representation to any ADT customer while soliciting the customer's business, including *without limitation*, as it relates to their relationship and/or affiliation with the manufacturer of the customer's alarm system equipment (i.e. General Electric or Honeywell)

(*Id.* at ECF p. 10, emphasis in original.)

### C.    Current Contempt Proceedings

ADT now alleges that Security One has continued to mislead ADT customers with telemarketer pitches telling them that (i) the caller is "with GE," the "company that made your alarm system," (ii) the caller "can see you are now paying $[amount] per month," and (iii) the customer was "placed" with ADT when the alarm system was purchased, leading customers to believe that the caller's company has a current relationship with the customer concerning the alarm system. ADT contends that the Security One telemarketers' statements, and the script from which they are working when they made the statements, violated paragraph 1(j) of the Permanent Injunction because they created the false impression that the caller represented the company that provided their alarm equipment. ADT contends that, in fact, Security One had no authorization to represent that it was a "dealer of GE" or a "GE Authorized dealer," according to the owner of the GE Security business that sells GE equipment, UTC Fire & Security ("UTC"). ADT argues that Security One cannot inoculate itself from contempt by simply saying that it reminded its overseas telemarketers to follow the standard script because the script itself is a violation of the Permanent Injunction. ADT contends that taking "all reasonable steps" to obtain compliance would have included removing any reference to GE in the script in 2013, not just in January 2016 after UTC

ordered Security One to cease any reference to GE Security.

In its own motion for contempt, Security One counters that ADT improperly disclosed confidential material in violation of the protective order entered by this Court on March 8, 2012 (Dkt. No. 63), both by filing documents with the Court and by sharing certain protected material with UTC, including six call transcripts marked "CONFIDENTIAL," in addition to discussions of protected material with UTC's counsel. Security One contends that the latter disclosures resulted in UTC terminating Security One's status as an authorized GE dealer. Security One contends that ADT's disregard of the Court's protective order, made at the same time that ADT demands confidential documents from Security One under the authority of the Permanent Injunction, puts Security One in the untenable position of having to choose between compliance with the injunction or withholding confidential information that ADT might otherwise disclose improperly.

## II.    APPLICABLE STANDARDS

On a motion for contempt, the moving party has the burden of showing, by clear and convincing evidence, that the alleged contemnor violated a specific and definite order of the court. *See Labor/Cmty. Strategy Ctr. v. Los Angeles County Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009); *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 856 n. 9 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (citing *Balla v. Idaho St. Bd. of Corrections,* 869 F.2d 461, 466 (9th Cir.1989)). If that moving burden is met, the alleged contemnor then has the burden to demonstrate why it was unable to comply. *Id.*; *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied,* 464 U.S. 1040 (1984). The alleged contemnor must show it took every reasonable step to comply. *Stone*, 968 F.2d at 856 n. 9.

Once a party has consented to a permanent injunction barring further violations of the Lanham Act, it occupies "a position less advantageous than that of an innocent party." *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997), *quoting Wella Corp. v. Wella Graphics, Inc*., 37 F.3d 46, 48 (2d Cir. 1994). "An infringer must keep a fair distance from the 'margin line'" and has "a duty to stay well away from" infringing conduct. *Wolfard Glassblowing*, 118 F.3d at 1320, *citing Plough, Inc. v. Kreis Labs*., 314 F.2d 635, 639 (9th Cir. 1963); *accord, e.g., Rebis v. Universal CAD Consultants, Inc*., No. C-96-4201 SC, 1998 WL

470475, at *4 (N.D. Cal. Aug. 11, 1998), *aff'd*, 189 F.3d 474 (9th Cir. 1999). The Ninth Circuit concluded that a party enjoined by consent from further Lanham Act violations "should have its conduct carefully scrutinized in future use and should not be allowed to claim the same leniency accorded a good faith user." *Wolfard Glassblowing*, 118 F.3d at 1320 (*quoting* 5 MCCARTHY ON TRADEMARKS § 30.21).

"[A] district court ordinarily should not impose contempt sanctions solely on the basis of affidavits;" rather a court should allow the alleged contemnor an evidentiary hearing. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998). However, no evidentiary hearing is warranted where the evidence submitted in support of the motion for an order to show cause does not make out at least a prima facie showing of contempt of this Court's Order.

**III.   PRELIMINARY FINDINGS OF FACT**

   **A.   UTC and GE Security Dealer Status**

1. UTC Commercial Operations Leader Angie Gomez declared that UTC is a manufacturer of residential and commercial intrusion products which sells its products to distributors and dealers who can then resell the products to another business or to an end-user customer. (Dkt. No. 389-1, Exh. 1, Gomez Decl., ¶¶ 1, 2.)[2]

2. UTC acquired GE Security in March of 2010 and was granted a limited license to continue to use the GE Security trademarks in connection with the sale of GE Security-branded equipment. (*Id*. ¶¶ 3, 4.)

GE Security had agreements with some independent retailers granting them a limited license to use GE marks and brands and to identify themselves as "[Company Name], An Authorized GE Security Dealer." (*Id*. ¶ 6.) The agreements strictly regulated the use of the GE trademarks, and prohibited dealers from identifying themselves as "General Electric" or "GE." (*Id*. at ¶ 7.)

---

[2] ADT provided in its moving papers the Declaration of Angie Gomez, the Commercial Operations Leader to UTC Fire & Security Americas Corporation, Inc., referred to herein as UTC. (Gomez Decl. ¶ 1.) The declaration is signed under penalty of perjury, but undated. Security One has not objected to the Court's consideration of the declaration.

5

Since acquiring GE Security in 2010, UTC maintained the right to provide a limited license to its dealers who purchase products, directly or through distribution, to refer to themselves as authorized GE Security dealers. (Vanis Decl., Dkt. No. 408-9, Exh. 1 ["Troise Depo."] at 10.)[3]

UTC's manufacture of GE-branded home security products was phased out over time and ceased in June of 2016. (*Id.* at 11.)

Many authorized GE Security dealers primarily sold monitoring services rather than GE-branded equipment. (*Id.* at 16-17.) UTC was aware that many of its authorized GE Security dealers sold monitoring services and that sometimes the only thing they were selling to the customer was monitoring services rather than the equipment. (*Id.* at 17.)

UTC's agreements with authorized GE Security dealers were, for the most part, not exclusive, *i.e.* they did not require that they sell only GE Security-branded equipment. (*Id.* at 18.)

### B.   Security One's Relationship Status as an Authorized GE Security Dealer

Security One is an independent retailer that entered into a contract with GE Security on or about January 7, 2010. That agreement was assumed by UTC for the remainder of the contract term, which expired December 21, 2010. (Gomez Decl. ¶ 9.)[4]

UTC and Security One continued to operate under the terms of the expired agreement. (*Id.* ¶ 10.)

In 2012, UTC manager Matt Schaberg received inquiries from Security One about renewing its authorized dealer relationship through an agreement with UTC. The agreement was never finalized, but in 2013 Schaberg confirmed by letter that Security One was still permitted to identify itself as a "GE Authorized Dealer" under the terms of the prior agreement. (*Id.* ¶¶ 11, 12.)

Schaberg's letter stated that "Security One and Interlogix [UTC] have continued to operate under terms of the expired agreement pending approval of its 2013 application." (Troise Depo. at

---

[3] On July 28, 2016, the parties deposed Emanuel A. Troise, III, UTC's designated corporate representative and Senior Director of Legal Affairs.

[4] The Court notes that neither party provided a copy of either the expired 2010 agreement in connection with these contempt proceedings, but rather rely on others' descriptions and interpretations of that agreement. However, the 2010 agreement appears in the record at Docket No. 218.

32.; Decl. of John O'Bryan, Dkt. No. 411-7, Exh. I [exhibits to Troise Depo.].)  Troise was not aware of any other action with respect to the 2013 application, or whether there was a subsequent application or other efforts to renew the agreement by Security One.  (*Id*. at 33.)

The 2010 agreement provides, at section 5(b):

> …provided that Dealer satisfies and continues to satisfy all requirements of this Agreement, Dealer is granted a limited, non-exclusive, non-transferable, and revocable license during the term of this Agreement to use the GE Security Marks in advertising, sales promotion and marketing materials, signs, displays, stickers, vehicle markings, and other marketing materials, **but only in connection with Dealer's authorized resale of Products**.  Dealer shall not use the GE Security Marks in its corporate or business name, or within its telephone greeting, letterhead, stationery, identification badges, **telemarketing scripts** or direct marketing materials, or promotional materials, **provided that** Dealer may utilize (orally or in written form) the following language at its sole discretion: *"An Authorized GE Security Dealer."*

(Dkt. No. 218, Dealer Agreement between GE Security and Security One, dated January 7, 2010, italics in original, bold supplied.)

Troise testified that the 2010 agreement meant that "certain approved resellers can use a manufacturer's logos and brands in restricted ways."  (Troise Depo. at 35.)  Troise further testified that the terms of the agreement meant that contracting parties could refer to themselves as an:
- "authorized dealer of GE Security products;"
- "authorized GE Security dealer;" or
- "authorized GE dealer;"

but would not be able to themselves outside of the scope of that authorized dealer identification, such as by referring to themselves as:

- GE or an affiliate of GE;
- some combination of their own name with the GE brand; or
- "a dealer of GE" or "with GE."

(*Id*. at 35-36; *see also* Gomez Decl. ¶ 13 [Security One has never had the right to identify itself as GE, or to claim to be "with GE," or to suggest any affiliation with General Electric, Inc.].)  Thus, "a statement saying they're a dealer of GE, if that was requested for us to review, we would have objected to it" and "with GE" would not have been permitted.  (Troise Depo. at 38.)

According to Troise, the terms of the agreement conveyed the use of the GE brand only in connection with the sale of GE Security-branded security equipment.  (*Id*. at 38-39.)  Troise stated

7

1  that the agreement meant that "[i]f the sale solely related to monitoring – monitoring services, no,
2  they would – they would not be permitted, technically, under the license to refer to themselves if
3  there's no connection with GE Security-branded products." (*Id*. at 41:4-8.)

4  With respect to use of the GE Security brand in efforts to sell monitoring services, Troise
5  stated that,

> the issue is that in certain cases, GE-branded equipment may be sold or it may be, in many cases, my understanding is, given away for free. So, essentially, if the offer is to give away equipment along with monitoring services, if that equipment is not GE-branded equipment, then it would be inappropriate. If we're using GE-branded equipment and design -- and -- in calls designed to promote monitoring services. [interruption in deposition] I--"

(*Id*. at 45.) The end of the witness's answer appears to have been cut off and not drawn out through follow-up questioning. It suggests that calls to promote monitoring on GE-branded equipment would be permissible, but the record is inconclusive on that point. However, Troise later testified that "[i]t would be our understanding that an authorized GE Security dealer would only use the GE brand in connection with the sale of GE-branded product." (*Id*. at 51.)

In October 2013, UTC requested Security One send to UTC copies of its telemarketing scripts in connection with a question about whether Security One was using the GE terminology appropriately. (*Id*. at 19.) Security One provided a sales script and a "managers Q and A confirmation script" on October 30, 2013. (*Id*. at 24-25.) UTC reviewed the scripts with reference to GE usage. (*Id*. at 19-20.) Troise testified that he was not aware of any objections to the scripts, and that the script's reference to Security One as an authorized GE Security dealer was permitted by the UTC Dealer Agreement and Brand Expression Guidelines. (*Id*. at 25.)

From mid-2013 until at least February 2016, Security One continued to be an authorized GE Security dealer, subject to the terms of the written agreement, despite its expiration, based upon a letter from UTC's Matt Schaberg to Security One. (*Id*. at 14.) Security One continued to be entitled to hold itself out to the public as an authorized GE Security dealer, pursuant to the terms of the written agreement. (*Id*. at 14-15.)

Between November 2013 and February 2016, there were no additional communications from UTC to Security One about its dealer status. (Troise Depo. at 20-21.) Troise was not aware

1  of whether Security One had ever followed up to ask for a new written contract after the fall of
2  2013.  (Troise Depo. at 54.)

3  UTC was aware that, throughout the period of mid-2013 through February 2016, Security
4  One was primarily selling security monitoring services.  (Troise Depo. at 16 ["Um, yes.  I am
5  aware that Security One was engaged in the selling of monitoring services, yes."].)

6  As of March 8, 2016, UTC informed Security One that it was no longer authorized to hold
7  itself out as an "Authorized GE Security Dealer" or to use any of GE's brands or marks in its
8  advertising.  (Gomez Decl. ¶ 16; Troise Depo. at 21-22.)  Until Security One received that letter, it
9  was an authorized GE Security dealer, and was entitled to hold itself out to consumers as an
10  authorized GE Security dealer, subject to the restrictions of the license contained in the 2010
11  written agreement.  (Troise Depo. at 22.)

12  **C.    Telemarketing Scripts Produced By Security One**

13  ADT submitted a telemarketing script produced by Security One to ADT on October 27,
14  2016 (Exhibit 4 to its Motion for OSC, Dkt. No. 377-1, filed under seal).[5]  The script produced by
15  Security One says, in pertinent part, "I'm calling as an authorized GE Security Dealer, Security
16  One.  GE is a manufacturer of home security systems.  The reason why I'm calling is because
17  when you first had your alarm system installed you were placed with a monitoring company.  The
18  rate you are paying is about $.... a month.…  We are doing a courtesy call to all customers that
19  have a security system to inform them that Security One is providing an upgraded monitoring
20  service at a lower rate than what you are currently paying…."  (*Id.*)

21  ADT also submitted additional telemarketing scripts.  (Vanis Decl., Dkt. 408-9, Exh. 2 and

---

[5] *See* Order at Dkt. No. 387 regarding sealing documents at Dkt. No. 377, and public versions of documents at Dkt. No. 389.  Although the Court ordered certain documents sealed in whole or in part, including the entirety of the call script submitted with ADT's motion, in advance of the hearing and consideration of these motions, it now finds that the portions cited herein should be unsealed as the public policies favoring disclosure of the factual record upon which decisions are based outweigh the reasons offered for sealing those documents.  *See Pintos v. Pacific Creditors Ass'n,* 605 F.3d 665, 678-79 (9th Cir. 2010).  The Court therefore **ORDERS** that the documents previously filed under seal at Docket No. 377 that were not previously filed on the public docket at Docket No. 389—specifically the portions of the telemarketing script at Exh. 4 cited herein and an unredacted copy of ADT's opening brief—shall be filed on the public docket forthwith.

1  3.) Those scripts included the language stating, "I'm calling from Security One an Authorized GE
2  Security Dealer.  GE is the manufacturer of your home security system," or simply "Hi, I'm
3  calling from Security One a GE Security Authorized Dealer."  (Vanis Decl., Exhs. 2, 3.)  One
4  script added, "this has nothing to do with your current provider and your current provider is still in
5  business."  (Exh. 3, emphasis in original omitted.)  Likewise, the manager's confirmation script
6  added, "I like to confirm each and every appointment to make sure everything is CRYSTAL
7  CLEAR and let you know that we are not affiliated with your current monitoring company and
8  your current company IS still in business."  (Vanis Decl., Exh. 3 at 2.)

9    The Court finds, based on its review of the totality of the evidence, that the telemarketing
10  scripts do not provide clear and convincing evidence of contempt of the Permanent Injunction by
11  Security One.  The scripts stay within the confines of the agreement that originated with GE
12  Security and was then assumed by UTC.  Some of the testimony offered raises doubts about
13  whether UTC believed the agreement entitled Security One to use its status as "an authorized GE
14  Security dealer" in sales pitches aimed solely at selling monitoring services.  However, the Court
15  cannot find, on this record, clear and convincing evidence that the agreement precluded, and
16  Security One was on notice that it precluded, using its "authorized GE Security dealer" status in
17  such circumstances.

18    **D.**  **Declarations and Call Transcripts Submitted By ADT**

19    The Court finds that two of the declarations submitted by ADT – those of Larry Biscayart
20  and Suzanne Karas—as well as four of the six call transcripts (SECONE00001, 000002, 000003,
21  000004) provide a sufficient showing of possible contempt of the Permanent Injunction to warrant
22  an evidentiary hearing.  Biscayart's declaration indicates that a Security One employee may have
23  misrepresented himself as being employed by ADT.  The other declaration and transcripts
24  identified above indicate that Security One's telemarketers made statements misrepresenting their
25  affiliation as being with "GE" rather than "GE Security."

26  **IV.**  **FURTHER PROCEEDINGS**

27    The Court therefore **ORDERS** that this case is **SET** for a scheduling conference on **Monday,**
28  **November 14, 2016, at 9:00 a.m.**, to discuss the scope of an evidentiary hearing regarding

10

contempt of this Court's October 1, 2013 Permanent Injunction in light of those preliminary findings.

Central to the Court's inquiry on the merits will be: (1) how often Security One's agents departed from the telemarketing scripts provided; and (2) how material were those deviations in terms of any damages ADT claims to have sustained as a result.

The parties should also be prepared to discuss what evidence they intend to present at an evidentiary hearing on the matters remaining at issue and a proposed schedule.

**IT IS SO ORDERED.**

Dated: October 19, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**